**COMMONWEALTH OF PENNSYLVANIA, Richard W. Baumann, Joseph Blume, James Mages and Bernard Peitz, Jr.**

v.

**James D. PORTER, Chief of Police, Frank L. Baranyai, Police Officer, Regis J. McCarthy, Mayor, Carl Seidl, President of Council, Maurice P. Bedel, Sr., James Beran, John L. Cavanaugh, Jerry Dawson, James H. Lawson and Stephen Mikus, Members of Council, all of the Borough of Millvale.**

Civ. A. No. 77–1164.

United States District Court,
W. D. Pennsylvania.

Nov. 16, 1979.

## OPINION

KNOX, District Judge.

### A. Introduction.

In this case involving claims of repeated violations of civil rights contrary to 42 U.S.C. § 1983 by Frank L. Baranyai (Baranyai) a policeman of the Borough of Millvale, Allegheny County, Pennsylvania, the court sitting non-jury has heard testimony over a period of 14 days. It is also claimed that Regis J. McCarthy (McCarthy), Mayor

of Millvale and James D. Porter (Porter), Chief of Police have instigated, acquiesced in, or ratified these violations and hence are named as defendants. The president and members of the Borough Council are also defendants, it being asserted that they were aware of Baranyai's conduct, took no action and supported him.

At the conclusion of the trial on May 10, 1979, the court dictated a memorandum as to the proceedings on the record with tentative findings in favor of the plaintiff on 22 incidents and in favor of the defendants on 11 incidents.

The parties were directed to file briefs with respect to these matters as well as other questions of law involved including the relief, if any, to be granted. Arguments on the merits were scheduled for June 27, 1979, but had to be postponed twice because of scheduling problems. They were finally held August 21, 1979, with additional materials being submitted at later dates. The court is now prepared to adjudicate the matter and enters the following:

### B. Findings of fact.

(1) This is an action brought by the Commonwealth of Pennsylvania and individual plaintiffs to enjoin defendants from engaging in a pattern of practice which denies citizens lawfully in the Borough of Millvale their constitutional rights to be free from physical violence, mistreatment, threats, harassment, illegal detention, illegal arrest, illegal searches and seizures, and other unconstitutional conduct.

(2) Plaintiffs allege that defendants have engaged and are engaging in a continuing course of unconstitutional police misconduct and abuse.

(3) Plaintiff Commonwealth of Pennsylvania brings this action on its own behalf and on behalf of its citizens, including the residents of the Borough of Millvale and all others who may lawfully be in Millvale.

(4) Individual plaintiffs are citizens of the United States and the Commonwealth of Pennsylvania and bring this action on their own behalf and on behalf of all persons residing in or otherwise lawfully in the Borough of Millvale and all persons who will in the future reside in or lawfully be in the Borough of Millvale. The court, however, refused to certify a class action, relying on the Commonwealth to represent the class.

(5) Defendant Frank L. Baranyai is and was a police officer employed by the Borough of Millvale at all times here involved.

(6) Defendant James D. Porter is employed by the Borough of Millvale as Chief of Police and has served in said capacity at all times relevant to this action.

(7) Defendant Regis J. McCarthy serves as Mayor of the Borough of Millvale and has served in said capacity at all times relevant to this action.

(8) All other defendants are present or past members of the Millvale Borough Council.

(9) The Borough of Millvale is a municipality incorporated as a Borough pursuant to the laws of the Commonwealth of Pennsylvania.

(10) The Borough of Millvale has established and maintains a police department pursuant to the Borough Code, 53 P.S. § 45101, et seq.

(11) On November 6, 1974, defendant Baranyai unlawfully arrested and detained Margaret G. Blume while she was lawfully standing on a street corner in the Borough of Millvale. While defendant Baranyai claims that Mrs. Blume, a woman in her late forties was dressed as her daughter Judy for the purpose of entrapping him into making false arrest, nevertheless, he concedes that he recognized her as the mother when she turned around. He packed her into the police car and took her to the station. The mother is much heavier set than the daughter.

(12) On November 16, 1974, defendant Baranyai brutalized and unlawfully assaulted and mistreated James Mages by beating him about the shoulders, arms, head and face with his fists and blackjack, by beating Mages' head against the wall, and by threatening to shoot him with a shotgun

and revolver, all of which occurred while Mages was handcuffed and confined in the Millvale Police Station. We find that Mages was handcuffed during the time that the incident arose as the result of unlawful arrest of one Walter Brightenbaugh without warrant.

(13) On July 10, 1975, defendant Baranyai beat and unlawfully assaulted and mistreated Richard Stefanick by striking him about the face and head with a flashlight while Stefanick was in his custody and control. The court does not condone Stefanick's prior conduct or hold the arrest was illegal, but this forms no legal basis for the beating after he was secure.

(14) On May 24, 1976, defendant Baranyai brutalized and unlawfully assaulted and mistreated Daniel Burchill by beating Burchill with a nightstick across the ribs while Burchill was handcuffed and in his custody and control. This attack was corroborated by Officer Cepek.

(15) On June 18, 1976, defendant Baranyai beat and unlawfully assaulted and mistreated Richard Stefanick with a blackjack while Stefanick was in his custody and control in the Etna Police Station. At the hospital where he was taken, edema and contusions about the face were found consistent with blows by a blackjack.

(16) On June 22, 1976, defendant Baranyai beat and unlawfully assaulted and mistreated Patrick Hughes by striking him about his arms and stomach with a nightstick while Hughes was in his custody and control in the Etna Police Station. The court finds the blows struck on the street did not constitute excessive force but the attack in the police station, verified by two other officers did.

(17) On January 29, 1977, defendant Baranyai unlawfully harassed and mistreated Franz J. Hersick by stopping his automobile, pulling Hersick out of his car, unlawfully arresting and detaining him in a cell and causing an illegal search to be made of Hersick's car. Hersick was refused the right to use the telephone to call his attorney and his car was unlawfully searched without warrant.

(18) On March 25, 1977, defendant Baranyai beat and unlawfully assaulted and mistreated David Stier and banged Stier's head against the pavement while taking him into custody. He had been subdued but Baranyai persisted in banging his head on the pavement and threatening to split his skull open. This was verified by testimony of a bystander. The force was excessive and might have resulted in a fractured skull.

(19) In November, 1977, defendants subjected Franz J. Hersick to unlawful retaliation, harassment and intimidation because he had complained of police misconduct and abuse by defendant Baranyai. He was entrapped by defendant Porter into going to the office of defense counsel Dice and there interviewed without his attorney. Attempts were made to get him to change his statement and Porter threatened him with suit for complaints against Baranyai.

(20) On March 15, 1978, and on various other dates, defendant Baranyai subjected Patrick Hughes to unlawful retaliation, harassment and intimidation because he had complained of police misconduct and abuse by defendant Baranyai. Hughes was told to get out of Millvale and stay out. This was corroborated by another officer and Baranyai claimed a right to tell persons selected by him to stay out of Millvale.

(21) On July 12, 1977, defendant Baranyai subjected Joseph Blume to unlawful arrest, retaliation, harassment and intimidation because he had complained of police misconduct and abuse by defendant Baranyai. He was attacked and punched, refused leave to use the telephone and not informed of charges against him. The court finds his repudiation of his complaint to Mayor McCarthy was made under compulsion by Baranyai.

(22) On April 12, 1978, shortly after the incident described in 20 defendant harassed Joseph Blume and wife eating a milkshake. He followed them and told them to stay out of Millvale. Blume is afraid to go into Millvale for fear of arrest.

(23) On November 17, Bernard Pietz was summoned to the police station in Millvale

by defendant Porter who yelled and shouted at him in attempt to intimidate him in connection with his giving testimony against Baranyai in a criminal trial about to commence in the Court of Common Pleas. He was threatened with suit if Baranyai was acquitted.

(24) On July 4, 1978, defendant Baranyai unlawfully arrested and detained Kimberly Urbanek, a Clerk of the County Court Reporters while she was lawfully standing on a sidewalk in the Borough of Millvale. She was taken to the police station and cited. Charges of loitering in violation of state law were dismissed by the Court of Common Pleas.

(25) On an unknown date, defendant Baranyai brutalized and otherwise mistreated Robert Angel by beating him with a blackjack while Angel was in his custody and control. This was verified by Sergeant Pfeiffer. On remonstration by Pfeiffer who was in charge Baranyai replied: "No one interferes with my arrests or tells me what to do."

(26) On March 2, 1979, defendant Baranyai unlawfully arrested and detained Gilbert R. Gruemken, Jack Dorn and Tom Newman while they were lawfully standing on a street corner in the Borough of Millvale. The court finds he stopped his police car, made them get in and took them to the police station without giving any reason.

(27) On March 15, 1979, defendant Baranyai arrested John Ayres, age 11, while he was lawfully upon the streets of the Borough of Millvale and further, he unlawfully detained and mistreated John Ayres while John was in his custody and control in the Millvale Police Station. The boy had kicked another boy without injury while emerging from a school bus. He was placed in a police car, taken to the station and interrogated concerning another incident without *Miranda* warnings and without calling his parents. He was threatened with Juvenile Court. On cross examination, it developed Baranyai did not regard this as an arrest.

(29) On March 30, 1979, defendant Baranyai unlawfully without warrant entered the home of Katy M. Nist and John J. Nist located in Reserve Township, and he did unlawfully conduct a search of the premises, of various personal belongings and of various individuals therein. The householder demanded a warrant and Baranyai responded he didn't need a warrant. There was no probable cause for the entry, the same being based upon a telephone call from an unknown informant broadcast over the radio. No known neighbors complained and no noise was audible on the sidewalk.

(30) On March 30, 1979, defendant Baranyai unlawfully ordered Jack Dorn to remove himself from the front steps of a Millvale resident's home or be arrested. The householder stated he had no objections to Dorn sitting on the steps.

(31) On July 14, 1977 and July 18, 1977, criminal complaints were filed in Allegheny County, Pennsylvania, against defendant Baranyai specifically alleging numerous of the incidents set forth above.

(32) On February 8, 1978, after a jury trial in the Allegheny County Court of Common Pleas, Criminal Division, defendant Baranyai was found guilty of one count of Simple Assault (18 Pa.C.S.A. § 2701), and two counts of Official Oppression (18 Pa.C.S.A. § 5301). The conviction of Simple Assault and one of the counts of Official Oppression arose from the criminal complaint filed by David Stier. The other count of Official Oppression arose from the complaint filed by Deputy Attorney General, Michael Louik, wherein Baranyai was accused of a pattern of misconduct and abuse beginning in the Summer of 1973.

(33) On June 26, 1978, defendant Baranyai was sentenced to pay a fine of $1,000, two years probation and to pay the court costs. This case is now on appeal. The affirmance or not of the convictions is of no importance here because in that case the Commonwealth was required to prove guilt beyond a reasonable doubt while here we are only concerned with preponderance of the evidence.

(34) At no time during the criminal proceedings against defendant Baranyai was he ever suspended, reprimanded or other-

wise disciplined by the other defendants. At no time whatsoever has defendant Baranyai ever been suspended, reprimanded or otherwise disciplined for any of the matters alleged in this action.

(35) On October 5, 1977, the complaint in this action was filed. Two days later on October 7, 1977, defendant Baranyai filed criminal charges against Deputy Attorney General Michael Louik, one of the attorneys herein, charging him with Barratry (18 Pa. C.S.A. § 5109) and harassment (18 Pa.C.S.A. § 2709). Said charges were filed against Deputy Attorney General Louik in his official capacity and alleged, among other things, criminal violations arising from the institution of this action. In February, 1978, defendant Baranyai withdrew these criminal charges.

(36) On the second day of the trial of this case in the hallway immediately outside the courtroom in which this case was being tried, the defendant Baranyai pointed out one of the attorneys for the plaintiffs and described him as representing the Mafia. This was in the presence of witnesses for the plaintiff who testified they felt harassed and intimidated. The defendant claimed he was unaware these were plaintiffs witnesses but admitted he had made similar statements previously. The court finds this is typical of defendant's conduct in attempting to harass witnesses and attorneys who bring proceedings against him. The court finds this is some evidence of consciousness of guilt.

(37) The other defendants have been aware of allegations of police misconduct and abuse by defendant Baranyai since at least April 13, 1974.

(38) Complaints regarding misconduct and abuse by defendant Baranyai were heard at numerous regular monthly meetings of Millvale Borough Council since August 13, 1974.

(39) Neither defendant Porter nor defendant McCarthy ever conducted a meaningful investigation or other inquiry to determine whether or not allegations regarding police misconduct and abuse by defendant Baranyai were true. Any investiga-

tions made were purely perfunctory going no further than asking Baranyai if the charges were true.

(40) Defendants Seidl, Bedel, Beran, Cavanaugh, Dawson, Lawson, and Mikus, members of the Borough Council, never conducted any investigation or other inquiry to determine whether or not allegations regarding police misconduct and abuse by defendant Baranyai were true. Beran did protest against the failure to investigate and was subjected to a personal attack by defendant Porter. Lawson also protested. Their protests were voted down.

(41) Although defendants have been aware of allegations of police misconduct and abuse by defendant Baranyai and although defendant Baranyai was convicted of said misconduct and abuse in the Allegheny County Court of Common Pleas, Criminal Division, defendants have taken no action whatsoever to end or otherwise deter the illegal conduct by defendant Baranyai. Defendants did support defendant Baranyai's illegal conduct and took official action in this regard on July 12, 1977, and February 14, 1978.

(42) Defendant Baranyai was convicted of criminal offenses involving police misconduct and abuse, and yet he continues to engage in said unconstitutional conduct with the knowledge, approval and participation of the other defendants and said unconstitutional conduct is likely to continue in the future, unless the situation is remedied by this court.

(43) With respect to the remaining incidents complained of by the plaintiffs, the court finds for the defendant, either because no evidence was submitted in support of the complaint or because the court finds that the plaintiff's case with respect to such complaints was not established by the preponderance of the credible evidence. These items are as follows (Numbering is from list of incidents contained in plaintiff's preliminary proposed findings of fact submitted May 11, 1979 and used by both parties throughout the trial of this case): 14. Unknown resident of Millvale, 15. Arthur, 16.

Bowman, 17. Peitz, 19. Thomson, 22. Zurcher, 25. Goetz, 27. Stefanick, 28. Thomas Brown, 29. Duffy, 30. Stefanick, 36. Robert Myers, (The court finds as to Myers that force was used, but it was only sufficient force necessary to subdue an unruly drunken prisoner), 37. Newman, 41. Eileen Ayres, 42. Unknown resident of Millvale, 45. Marta Dorn.

(44) The court also finds against the plaintiffs and in favor of the defendants with respect to the matter of Kevin Walsh and Mark Miller the subject of the matter heard on petition for additional hearing and additional proposed finding of fact. The court finds that in this instance, the preponderance of the evidence is in favor of the defendants.

## C.  Discussion.

Gilbert and Sullivan many years ago pointed out: "When constabulary's duty's to be done, the policeman's lot is not a happy one." [1]

The truth of this observation comes home here where we have a case largely centered against one police officer, a member of a small borough police force, who has had some training and has demonstrated zeal and initiative in the performance of his duties. It is inevitable that in the performance of his duties a policeman of this type should meet with resistance and become the subject of vilification. We have made due allowance for this with respect to certain incidents complained of, finding that the weight of the evidence is with the defendant.

We do find, however, that in a large number of incidents as set forth in the findings of fact, supra, the defendant Baranyai has engaged in a pattern of practice denying citizens residing in and otherwise lawfully in the Borough of Millvale, Allegheny County, their rights to be free from physical violence, mistreatment, threats, harassment, illegal detention, illegal arrest and illegal searches and seizures. If we were confronted with only a single isolated incident charged against defendant Bar-

anyai, we would relegate the individual plaintiff to a suit for damages under the Civil Rights Act. We do, however, find that there is a long continued pattern of misbehavior which justifies the intervention of the equitable powers of this court in an endeavor to protect citizens from further mistreatment of the type outlined. In other words, we find Baranyai, in many instances, is too zealous in the performance of his duties and resorts to excessive force. There are several incidents here of illegal arrest of citizens whose only offense was standing on a sidewalk in the Borough of Millvale. Other people have been beaten as demonstrated by testimony of the third parties and corroboration by doctors at hospitals. In many instances, he seems to derive satisfaction from such a course of conduct, taking prisoners who are already secure, in custody and handcuffed with their hands behind their back to a place in the basement of the Millvale Police Station where he "works them over" with a blackjack or nightstick. We cannot tolerate misconduct of this kind.

The U.S. Supreme Court has recently said with respect to the rights of citizens in this respect in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977):

"The Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth, was intended to give Americans at least the protections against governmental power that they had enjoyed as Englishmen against the power of the Crown. The liberty preserved from deprivation without due process included the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men'. *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923); see *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889). Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.

---

1.  Gilbert & Sullivan "The Pirates of Penzance" (1880).

"While the contours of this historic liberty interest in the context of our federal system of government have not been defined precisely, they always have been thought to encompass freedom from bodily restraint and punishment. See *Rochin v. Calif.*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952). It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law.

"This constitutionally protected liberty interest is at stake in this case. There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned. But at least where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated."

The Supreme Court notes that under our Constitution, we are entitled to at least the protection against governmental power which the colonists had previously enjoyed as Englishmen against the power of the Crown. The language in *Ingraham v. Wright*, is an echo of the words of Magna Carta laid down in the year 1215 in an attempt to curb the arbitrary exercise of power by the king.[2]

Our Civil Rights Act, 42 U.S.C. § 1983, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

We have noted the Mayor and Borough Council of the Borough of Millvale have been aware of the conduct of the defendant Baranyai at least from the year 1975 to the present date and have made no adequate investigation of the complaints made to them or made at Council meetings. Any investigation conducted by the Mayor or Chief of Police was a perfunctory investigation only involving merely asking the defendant Baranyai whether he had engaged in the conduct complained of. No attempt was made to interview the citizens and to determine whether there were witnesses to support their complaints.

We further find that the Mayor and Chief of Police, defendant Porter, have to a large extent aided, abetted, confirmed and ratified the conduct of the defendant Baranyai and in many cases have instigated the conduct complained of and have threatened and harassed citizens who were bold enough to make complaints as to this course of action.

The findings of fact alone should be sufficient to justify equitable intervention. The complaint merely asks for a preliminary and permanent injunction prohibiting defendants from subjecting the residents of Millvale and other persons lawfully in Millvale to unconstitutional physical violence, mistreatment, threats or harassment and from unconstitutional detentions, searches, seizures, arrests and imprisonment. We are not asked to award damages to any individual plaintiff but only to take steps by way of injunctive relief to protect the citizens from this course of conduct in the future. We will, however, discuss certain legal questions which present themselves in this case.

### (1) The *Rizzo* case.

The defendants originally moved to dismiss this case alleging that the court had no power to interfere with the operations of the police force in the Borough of Millvale, Allegheny County under the decision of the

2. "No Freeman shall be taken, or imprisoned, or be disseised of his Freehold, or Liberties, or free Customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we pass upon him, nor condemn him, but by lawful Judgment of his Peers, or by the Law of the Land. (2) We will sell to no man, we will not deny or defer to any man either Justice or Right."

U.S. Supreme Court in *Rizzo v. Good,* 423 U.S. 362, 96 S.Ct. 598, 26 L.Ed.2d 561 (1976). We held in denying the motion to dismiss and again hold that the *Rizzo* case is a different species of animal from the case before us. In the *Rizzo* case, two officers of the Philadelphia Police Force an organization of 7500 officers serving a city of 1,750,000 people, which police officers were not named as parties to the complaint, were charged with violating the rights of individuals. The court pointed out there was no proof of any plan or policy by the defendants, express or otherwise, which showed their authorization or approval of the policemen's misconduct. In the instant case there is ample evidence of such authorization or approval, particularly by the defendant Mayor and Chief of Police. The *Rizzo* court also emphasized several times that the individual police officers were not named as parties. In fact, this was printed in italics at various points in the opinion. Here we have the defendant policeman named as a party defendant and most of the trial was spent in examining instances of his alleged misconduct. We are not asked to assume here the supervision of a police force of a large metropolitan city. The cases of *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) and *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 219, 40 L.Ed.2d 566 (1974) were distinguished on the grounds that the individuals charged with misconduct were there named as defendants in the action and it also appeared that there was an adoption of a deliberate policy by public officials in charge of the police force and a pervasive pattern of intimidation. This is the situation in the case at bar. It was further held that the delicacy of adjustment between federal equitable power and state administration of its own laws required the federal court to withhold its hand on principles of comity and equity which restrain a federal court in dealing with state officials. In contrast, in this case, the Commonwealth of Pennsylvania has brought this suit as parens patriae of its citizens in an effort to protect them from this unconstitutional mistreatment. This

will be dealt with in the next subdivision of this opinion. Suffice it to say for this purpose the comity and equity which restrain a federal court in mixing in state affairs do not operate since the Commonwealth itself has asked us to assist them in putting a stop to these things for which they claim they have no adequate remedy at law.

■ Nor is this the case of *Lewis v. Hyland,* 544 F.2d 93 (3d Cir. 1977), where the Court of Appeals for this Circuit refused to restrain the entire New Jersey State Police Force from harassing certain types of individuals from using the New Jersey highways since it was held that the court under *Rizzo* should not undertake supervision of the entire New Jersey State Police Force, that mere showing of a statistical pattern was no basis for belief. On the contrary, here the evidence shows that the defendant public officials, particularly the Mayor and Chief of Police, have not only condoned Baranyai's misconduct but approved and ratified the same and have intimidated or attempted to intimidate citizens who would testify or complain against him. We are cautioned in *Washington Mobilization Commission v. Cullinane,* 184 U.S.App.D.C. 215, 566 F.2d 107 at 122 (D.C.Cir.1977) against reading *Rizzo* too broadly. We hold here that there is no application of *Rizzo v. Good* to this situation involving an individual policeman in a small borough police force in a small municipality in Allegheny County with a population of 5,000 which would prevent this court from vindicating the rights of citizens against conduct such as has been shown in this case.

(2) The Parens Patriae Question.

The defendants soon after this action was brought filed a motion to dismiss claiming that the Commonwealth of Pennsylvania had no standing to bring this suit. The court held that the objection as originally filed was well taken but the defect was amendable if individual plaintiffs who had been wronged by the defendants also joined. See memorandum opinion of this court filed February 24, 1978. We will not repeat at length what was said there but

merely point out that it was held that there was no showing that the Commonwealth of Pennsylvania had been injured personally by the series of events alleged in the complaint under 42 U.S.C. § 1983 but rather claimed the right to bring the suit as parens patriae on behalf of its citizens. At that time, the court queried whether the Commonwealth of Pennsylvania with all of its courts and authority was not able to obtain sufficient relief in its own tribunals without bringing such a controversy to the federal court. It has since then been determined, however, that the Commonwealth has no ready remedy inasmuch as the provisions of the Borough Code [3] provide for removal of a police officer by Council on complaint from the Mayor but the termination is then reviewable by the Civil Service Commission. In the present case, in view of the fact that the Mayor we find has been instigating and ratifying and confirming what Baranyai has done, the remedy appears to be almost useless, particularly in view of the fact that the Mayor has made only perfunctory investigations when complaints have been brought to his attention. We did hold that the rights of the Commonwealth as parens patriae had been expanded in recent years beginning with the Supreme Court case of *Hawaii v. Standard Oil Company*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The very words "parens patriae" refer to the powers of the English sovereign as father of his country which rights have now vested in the Commonwealth of Pennsylvania since the revolution. It has been held, of course, by the Court of Appeals for this Circuit that the Commonwealth does not have a right to bring an action to redress all injuries received by any of its citizens. See *Commonwealth of Pennsylvania v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11 (3d Cir. 1975), where it was pointed out that the Commonwealth could bring a suit where its own property had been affected or where the general public had suffered an injury so that no one individual had legal standing to sue. *National Association of Flood Insurers* was a property damage case. The instant case is a question of violation of the constitutional rights of the citizens of Pennsylvania and we held that the Commonwealth did have an interest in the violation of such rights which are guaranteed under both federal and state constitutions and which affect the welfare of Pennsylvania citizens. It was previously held by this court that where individual citizens have filed a suit alleging violation of their rights, the Commonwealth had a right to join as an intervening plaintiff. See *Jordan v. Erie School District*, CA 73–34 Erie, reversed and remanded on other grounds, 548 F.2d 117, where unconstitutional actions of the Erie School District were alleged and the Commonwealth was permitted to intervene to represent the rights of these citizens as well as others. The right of the state to bring such a suit was recognized in *Commonwealth v. Glickman*, 370 F.Supp. 724 (W.D. Pa.1974, Teitelbaum, J.)

The order of February 24, 1978 indicated that suit should be dismissed unless individual citizens who have been deprived of their rights as set forth in the complaint joined as party plaintiffs in this action within 20 days. Such persons did join, viz: the individual plaintiffs Richard W. Baumann, Joseph Blume, James Mages and Bernard W. Peitz, Jr., individually and on behalf of all others similarly situated. While the court did not certify a class action, it was held that the case was one in effect in view of the fact that the Commonwealth was representing the rights of all of its citizens and we are treating this case in such light. We, therefore, hold that the action is properly brought by the Commonwealth joining to protect the constitutional rights of its citizens and to support those individuals who have specifically joined alleging individual grievances.

While the complaint of Baumann has not been sustained, certain complaints of the other individual plaintiffs have been. The court holds that this is sufficient for this purpose and to establish a case or controversy under Article III of the Constitution since we find these persons have reasonable

---

3. 53 Purdons P.S. § 46121 et seq. See § 7 of discussion, infra.

grounds to apprehend further mistreatment in the future.

### (3) Statute of Limitations.

This suit was filed October 5, 1977. The defendant Baranyai has throughout the trial objected to evidence of any events back of the one or two year period preceding the bringing of suit claiming that such evidence should not be permitted under the statute of limitations. It should be sufficient answer that such evidence is admissible under Rule 404(b) to show motives, intent, preparation, purpose, knowledge or absence of mistake or accident and to show plan or design. It is also admissible under Rule 406 to show a pattern or routine practice of a defendant or organization.

The Court of Appeals for this Circuit in *Polite v. Deihl*, 507 F.2d 119 (3d Cir. 1974) has held that since there is no federal statute of limitations under the Civil Rights Act, the state statute of limitations applies and in this area you have to separate an incident into its various components, thus the Pennsylvania statute of limitations for false arrest and malicious prosecution is one year. 12 P.S. § 51 (now repealed). This includes incidental assaults and batteries in connection with the false arrest but does not include beatings occurring after the arrest. As to these, the two year statute of limitations for personal injuries or for assaults and batteries themselves and false imprisonment is applicable. 12 P.S. § 34, 12 P.S. § 31. See also *Ammlung v. City of Chester*, 494 F.2d 811 (3d Cir. 1974).

In the instant case, the only incidents as to which these statutes of limitations might apply are No. 11 Margaret Blume, false arrest November 6, 1974, No. 12 James Mages, assault and battery November 16, 1974, and Richard Stefanick, assault and battery, July 10, 1975. All the other incidents from No. 13 forward are within the appropriate period of limitations.

█ It should be emphasized again that this is not a suit for damages resulting from assaults and batteries and false arrests. If we were faced with the task of awarding damages for these instances, we would, of course, hold that Nos. 11, 12 and 13 were time-barred by the Pennsylvania statute of limitations, but otherwise we hold that they are admissible for the purposes above set forth. It has been so held in similar cases. *Williams v. Anderson*, 562 F.2d 1081 (8th Cir. 1977); *Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Hazelwood School District v. U. S.*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). As noted in Footnote # 15 of Hazelwood, this would be particularly true where the relevant aspects of the decision making process have undergone little change and such is the case here where the attitude and actions of the defendants have been the same down through the years 1974 to date. Such evidence is particularly appropriate in a case like this where we have a difficult problem in fashioning appropriate relief and we must therefore consider even time-barred incidents not too remote for the purpose of establishing a pattern of conduct which has not to this moment in time been abated.

### (4) Warrantless Entry Into Private Dwelling for Making of Arrests and Search.

The so-called Nist incident is recounted in Finding of Fact No. 29 in general but merits a somewhat fuller discussion. In this case, defendant Baranyai with some other Millvale Officers were called to support the police in Reserve Township, an adjoining municipality. This was under a backup or assist arrangement between various municipalities in that area. As noted, the Reserve Township Police had received information over the radio about a telephone call from an unknown informant saying that a party and disturbance were going on at the residence of Katy M. and John J. Nist (Katy was the mother) in Reserve Township. The information from an unknown informant was obviously insufficient to justify the issuance of a warrant and when the police arrived, no noise or disturbance was audible on the sidewalk or in the neighborhood and so there were insufficient grounds to justify entry since no disturbance was apparent and there were no neighbors in the immedi-

ate vicinity who were complaining. John J. Nist met the officers in front of the house and when questioned, he said that there was a party or get together going on. Baranyai and the Reserve Township Officer said we are going in to inspect. Nist replied that they had to have a warrant and demanded a warrant. Baranyai told Nist that he did not need a warrant. It appears that Baranyai was the first in the house and he proceeded to ransack the purse and other belongings of Mrs. Katy Nist who was upstairs watching television and also he conducted a search of the rest of the house. According to his story, he was looking for one of the persons at the party who had run upstairs. In this he was justified if his entry was legal, but he was not justified in making detailed searches of the purse and the belongings of Mrs. Nist in looking for the escapee. (The escapee was found lurking under a bed on the second floor.)

The court holds that under these circumstances, there was no justification for entering the house. The court is aware that *Payton v. New York*, is presently before the U.S. Supreme Court, No. 78–5420, on reargument but the case is not dispositive. See summary of the argument in *Payton* before the U.S. Supreme Court at 48 U.S. Law Week 3267. In that case the New York Court of Appeals had split four to three holding that an entry to arrest a felon did not require a warrant. The Court of Appeals for the 8th Circuit, however, more recently in *U. S. v. Houle*, 603 F.2d 1297 (8th Cir. Aug. 17, 1979) has held flatly, following *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, that a warrantless entry into a private home whether to make an arrest or to make a search, both of which occurred in this case, is per se unreasonable in the absence of a number of well defined "exigent circumstances". In the instant case, the officers made no attempt to secure a warrant and under the information at their disposal could not have secured a valid warrant. There were no exigent circumstances such as hot pursuit or a public disturbance which would have justified entry without a warrant, whether to arrest or to search, both of

which occurred here. We, therefore, hold that the entry into the Nist house was unlawful, the search was unlawful and that they should be considered as another one of the incidents involving Baranyai since he acted as a leader albeit he had been called by the Reserve Township Police.

Underage drinking is a summary offense governed by Pa.R.Cr.P. 51 formerly 102. A warrantless arrest is only justified where there is breach of the peace which endangers the property or safety of any person present. *Commonwealth v. Shillingford*, 231 Pa.Super. 407, 332 A.2d 824 (1975). This apparently has not filtered through to the Millvale Police Department, particularly Baranyai who tends to regard this offense as a heinous felony under the evidence in this case.

(5) Baranyai Is Subject to Equitable Relief Against Further Violation of Citizens' Civil and Constitutional Rights.

As has been shown in the findings, the defendant Baranyai has on numerous occasions been guilty of the use of excessive force or unreasonable force in making an arrest. In many instances where we have found the arrest justified, he has been guilty of extreme assaults upon prisoners after they are lawfully in custody at a police station so the application of force is no longer necessary. This court holds that this gives rise to a cause of action under 42 U.S.C. § 1983 and subjects him to equitable relief. See *Curtis v. Everett*, 489 F.2d 516 (3d Cir. 1973); *Polite v. Deihl*, 507 F.2d 119 (3d Cir. 1974); *Howell v. Cataldi*, 464 F.2d 272. As the court held in *Howell v. Cataldi*, supra, where the application of force by a police officer exceeds that which is reasonable and necessary under the circumstances and also violates standards of decency more or less universally accepted, it amounts to cruel and unusual punishment. Where light blows are administered, they might be considered a mere tort under state law and not subject to suit under 42 U.S.C. § 1983. But here, this conduct and the manner of administering it grades into cruel and un-

usual punishment under *Ingraham v. Wright,* supra.

It has further been held that making of an arrest without probable cause is a constitutional violation under § 1983. See *Patzig v. O'Neil,* 577 F.2d 841 (3d Cir. 1978). We hold that plaintiffs are entitled to equitable relief against Baranyai's conduct in this respect which is likely to be repeated in the future.

The likelihood of repetition in the future is borne out by the fact that in two of these incidents, the witnesses testified they were afraid to come into Millvale for fear of arrest and Baranyai, himself, under cross examination admitted that he was accustomed to telling people to get out of Millvale and stay out or they would be arrested. When questioned by the court as to his right to inflict these people on other municipalities, his reply was that he had authority to do this and they should go back where they belong.

A sentence of outlawry is certainly not authorized for even a trial court of general jurisdiction. See summary of the law in this respect recently in *Rutherford v. Blankenship,* 468 F.Supp. 1357 (W.D. Va.1979) where there is a review of the background of orders of outlawry and banishment. Banishment was a part of the penalties inflicted under English law before and immediately after the Revolution but has never been permitted in this country. As the court well says "To permit one state to dump its convict criminals into another is not in the interest of safety and welfare; therefore the punishment by banishment to another state is prohibited by public policy." See also *Dear Wing Jung v. U.S.* 312 F.2d 73 (9th Cir. 1962); *People v. Baum,* 251 Mich. 187, 231 N.W. 95 (1930). In this particular case, there is no authority in law for an individual policeman to take it upon himself to determine which person should be subject to a de facto sentence of banishment. We hold in this respect there is a violation of the constitutional rights of U.S. citizens to move freely within the confines of this country.

### (6) The Anti-Loitering Ordinance of the Borough of Millvale.

The Borough of Millvale has an ordinance governing disorderly conduct and loitering, Ordinance No. 305 adopted January 3, 1911. Insofar as we are concerned in this case only sections Q and R are involved. The definition of disorderly conduct contained in this ordinance (see joint Ex. B) provides:

"Q. All persons persisting in loitering upon the public highway or streetcorners and in front of any stores, shops, places of business, place of amusement or place of worship after being requested to vacate such place or places and move on.

"R. All habitual street or corner loafers."

The court appreciates that the Borough of Millvale like a number of other municipalities in Pennsylvania has a problem with gangs or groups of persons congregating in front of various stores or on street corners so as to block the passageways and to some extent terrorize older citizens. These situations, however can be dealt with under other laws without applying the vague provisions of ordinance No. 305.

The defendant Baranyai particularly uses this ordinance to justify his conduct in falsely arresting a number of the complainants in this case, to wit: Margaret Blume, Kimberly Urbanek, Gilbert Gruemken and Jack Dorn who were simply standing on a sidewalk doing nothing, blocking no one and creating no hazard. As the court remarked at one point early in the trial, it appears to be a criminal offense in Millvale subjecting one to arrest merely to stand upon a sidewalk. As stated, we recognize that municipalities have a legitimate concern in avoiding obstructions of sidewalks and public passages but it is believed that the state law (18 Pa.C.S.A. § 5507) furnishes sufficient basis for handling this problem by the police without resorting to false arrest and other violations of the federal constitution.[4]

---

4. 18 CPSA § 5507. Obstructing highways and other public passages.

(a) Obstructing.—A person, who, having no legal privilege to do so, intentionally or reck-

It will be noted that the state law covers offenses by a person who having no legal privilege to do so intentionally obstructs a highway, sidewalk or other public passage. The final sentence of subsection (a) gives protection to the right of free speech which does not appear to be concerned in any of the incidents before us. The word obstruct is so defined in subsection (c) as to mean rendering impassable without unreasonable inconvenience or hazard and subsection (b) prevents abuse of the words "refusal to move on" in that there must be a reasonable official request or order to move to prevent obstruction of a highway or other public passage or to maintain public safety. In the instances before us as above recited in this case, no one of these elements were present. It appears that these citizens were simply present on a sidewalk doing nothing, blocking no one and creating no hazard and yet the ordinance was distorted by Baranyai to cover their arrests and removal to the police station without statement of any reason being given for the same. The court finds that this is going too far under the decisions of the U.S. Supreme Court. See *Brown v. Texas*, —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (requiring a citizen upon request by the police to identify himself was unconstitutional applies where the officers lacked any reasonable suspicion to believe that the person was engaged or had engaged in criminal conduct). It was stated that seizure of a person under such circumstances must be based on specific objective facts indicating that society's legitimate interests require the seizure of the particular individual and it was held that in such a case the right to personal security and privacy tilts in favor of freedom from police interference. We find the same situation to exist here.

In *Shuttlesworth v. Birmingham*, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), the court was confronted with an ordinance similar to that of Millvale's but which had been construed by the Alabama courts to cover only cases of obstructing passage and where there was obstruction the defendant refused to move on after request by an officer. In none of the cases before us did this fact exist, but the officer took the ordinance literally to support the arrest of a person who was merely standing on the sidewalk obstructing no one. See also *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

With respect to good faith on the part of the officer in making these arrests, the court finds it is difficult to believe since it was shown the other officers of the police department did not enforce this ordinance in this manner. Rather, it was used by Baranyai to arrest people he did not like or to arrest people for no reason at all either to show his authority or in some way to deter others. However this may be and assuming that Baranyai was acting in good faith in enforcing this ordinance at the behest of his superiors the Chief and the Mayor, who instructed him and other policemen to use the ordinance to break up street corner gangs, this would not amount to a defense against equitable relief sought by the plaintiffs where the evidence shows that he had continued and the inference is he intends to continue such a course of

lessly obstructs any highway, railroad track or public utility right-of-way, sidewalk, navigable waters, other public passage, whether alone or with others, commits a summary offense, or, in case he persists after warning by law officer, a misdemeanor of the third degree. No person shall be deemed guilty of an offense under this subsection solely because of a gathering of persons to hear him speak or otherwise communicate, or solely because of being a member of such gathering.

(b) Refusal to move on.—

(1) A person in a gathering commits a summary offense if he refuses to obey a reasonable official request or order to move: (i) to prevent obstruction of a highway or other public passage; or (ii) to maintain public safety by dispersing those gathered in dangerous proximity to a fire or other hazard.

(2) An order to move addressed to a person whose speech or other lawful behavior attracts an obstructing audience, shall not be deemed reasonable if the obstruction can be readily remedied by police control of the site or location of the gathering.

(c) Definition.—As used in this section the word "obstructs" means renders impassable without unreasonable inconvenience or hazard.

conduct. No one is seeking damages from him for making these arrests in the past. What the court is asked to do is restrain such arrests which have no basis in law in the future. See *Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566, where the court said: "Isolated incidents of police misconduct under valid statutes would not, of course, be cause for the exercise of a federal court's equitable powers. But '[w]e have not hesitated on direct review to strike down applications of constitutional statutes which we have found to be unconstitutionally applied.' . . . Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." *Michigan v. De Fillippo*, —— U.S. ——, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) does not apply here. That case involved suppression of evidence obtained in the course of an arrest under an ordinance later held invalid.

Again, in *Brown v. Bathke*, 566 F.2d 588 (8th Cir. 1977), the court held that the qualified immunity for public officials enunciated in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) applies only to damages not to equitable relief.

Under these circumstances, it is not necessary to make a formal holding of vagueness or overbreadth with respect to this ordinance. All we hold is that as construed and applied by Officer Baranyai, it has re-sulted in false and baseless arrests of various citizens.

▉ It should be noted that he believes that any citizen is subject to the whim of an individual officer and may be required to move or be placed in a police car. This is intolerable. Only if limited to clearing substantial obstructions is it reasonable. *Washington Mobilization Committee v. Cullinane*, 184 U.S.App.D.C. 215, 566 F.2d 107 (D.C. Cir. 1977).

(7) Parties Subject to Injunctive Relief.

The court has previously held that Officer Baranyai himself is subject to equitable relief the exact nature of which will be determined hereafter in this opinion and the order accompanying the same. The court also holds that the other defendants, viz: Chief of Police Porter, Mayor McCarthy and the Borough Council of Millvale are also subject to injunctive relief in this court so as to protect the rights of United States citizens in the future.

Before proceeding further, we should consider the legal setting in which the police department of a Pennsylvania Borough such as Millvale functions. The basic section of the Pennsylvania Borough Code dealing with this matter is 53 P.S. § 46121 as amended by Act February 1, 1966, P.L. (1965) 1656, No. 581, § 1121.[5]

---

**5.** "§ 46121. Appointment, suspension reduction, discharge, powers; mayor to have control. Borough council may, subject to the civil service provisions of this act, if they be in effect at the time, appoint and remove, or suspend or reduce in rank, one or more suitable persons, citizens of the United States of America, as borough policemen, who shall be ex officio constables of the borough, and shall and may, within the borough or upon property owned or controlled by the borough or by a municipal authority of the borough whether such property is within or outside the limits of the borough, without warrant and upon view, arrest, and commit for hearing any and all persons guilty of breach of the peace, vagrancy, riotous or disorderly conduct or drunkenness, or who may be engaged in the commission of any unlawful act tending to imperil the personal security or endanger the property of the citizens, or for violating any ordinance of the borough for the violation of which a fine or penalty is imposed, and notwithstanding any statute per-taining to the same or similar offenses. Any person so arrested shall be received for confinement by the keepers of the jails, lockups, or station houses within the county.

The borough council may designate one of said policemen as chief of police. The mayor of the borough shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties, except that council shall fix and determine the total weekly hours of employment that shall apply to the policemen.

\* \* \* \* \* \*

The borough may, by ordinance, establish a police department consisting of chief, captain, lieutenant, sergeants, or any other classification desired by the council, and council may, subject to the civil service provisions of this act, if they be in effect at the time, designate the individuals assigned to each office, but the mayor shall continue to direct the manner in

Under this, it will be noted that the borough council has the right to appoint and remove or suspend or reduce in rank borough policemen and may designate one of the policemen as chief of police (in this case defendant Porter). It is further provided in the second paragraph that the mayor shall have full charge and control of the chief of police and police force and has the right to direct the time, place and manner in which they shall perform their duties.

In 53 P.S. § 46124 [6] it is provided that the mayor also may suspend policemen without cause until the next succeeding regular meetings of the council at which time the council may take action as to suspensions, discharges, etc.

Provision is also made in 53 P.S. § 46190 for specific grounds for removal or reduction in rank of a policeman and in § 46191 provision is made for his right to demand a hearing before the civil service commission. It appears that in the case of the Borough of Millvale there is a civil service commission operating and if suspended by Borough Council, Baranyai would have a right to a hearing before the commission and then to take a further appeal to the Court of Common Pleas and thence up through the courts. It would seem obvious that in connection with its powers to suspend or remove a policeman the borough council would have the right to conduct such investigations or hearings as they deem proper and also it is noted under 53 P.S. § 46029(3) the mayor has a duty to report on the state of the borough to the council which would seem to indicate all matters pertaining to

borough welfare such as misconduct by the police force. The Commonwealth is correct in claiming that procedures under Pennsylvania law are so cumbersome and ineffectual in a civil rights case as to leave citizens without adequate remedy at law.

■ In the instant case, we hold that the Chief of Police, the Mayor and the Borough Council have all been so deeply involved in the misconduct of Officer Baranyai as heretofore determined that they are subject to injunctive relief in an attempt to remedy the situation.

## (A) Chief of Police Porter.

The evidence indicates that despite complaints Porter never found fault with Baranyai pertaining to the charges. He took no action to discipline him after he was convicted in criminal court of malfeasance in office, he has publicly supported Baranyai in all instances, he could not give a single instance of a report of an investigation to the complainant, and he retaliated against other officers, viz: Cepek, Fishinger, Pfeiffer and Snyder who testified or otherwise complained relative to Baranyai's conduct. The Chief was also the recipient of a complaint from the district attorney of approaches by policemen and the chief himself to witnesses subpoenaed to testify at the Baranyai hearing in his criminal trial in common pleas court in an endeavor to influence the testimony of such witnesses in Baranyai's favor.

---

which the persons assigned to the office shall perform their duties. The mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their duties. The mayor may appoint special policemen during an emergency in which the safety and welfare of the borough and the public is endangered and auxiliary policemen may be appointed as provided by general law."

**6.** "§ 46124. Suspension by mayor.
In addition to the powers of council to suspend policemen, the mayor may, for cause and without pay, suspend any policemen until the succeeding regular meeting of the council, at which time or thereafter the council may, sub-

ject to the civil service provisions of this act, if they be in effect at the time, suspend, discharge, reduce in rank or reinstate with pay, such policemen: Provided, however, That a policeman suspended by the mayor may not be reinstated by council at a date earlier than ten working days from the date fixed by the mayor for the suspension to commence. In any case where the council has reinstated a policeman, after having been suspended by the mayor, the mayor shall not thereafter suspend such policeman for reasons arising from the same act for which the first suspension was made, or for reasons that the council, in reinstating such policeman, shall have determined not to be grounds for suspension."

### (B) Mayor Regis McCarthy.

The evidence ·in the case is that Mayor McCarthy instigated the police department in using broad powers under Ordinance No. 305 of 1911 to move people off the street who were doing nothing and not obstructing passage and to arrest them upon failure to move at the officer's whim. As is well stated by the defendant the law is that to hold persons subject to relief in this court there must be a showing of actual knowledge, participation, ratification and aiding and abetting. The mere passive sitting by and doing nothing is no grounds for granting relief. See *Walker v. University of Pittsburgh*,. 457 F.Supp.· 1000 (W.D.Pa. 1978); *Santiago v. City of Philadelphia*, 435 F.Supp. 136 (E.D.Pa.1977). Mayor McCarthy was in receipt of numerous complaints relative to Baranyai's conduct both in and outside council meetings but he found that all complaints were unjustified. Mayor McCarthy told council he would investigate and report back but in most cases no report was made. Any investigation made was, as previously found by this court, perfunctory in nature only and consisted of asking Chief Porter or Officer Baranyai whether there was any basis for the complaint.

Mayor McCarthy has publicly stated that: "As long as I am Mayor, I will not suspend Frank Baranyai from the Millvale Police Force." He also participated in the retaliation against other officers who testified or complained relative to Baranyai. We therefore find that he is causally linked to this pervasive pattern of violation of constitutional rights and is subject to relief under *Rizzo v. Good*, supra, that he is causally linked to police abuse and that practices in this case certainly rise to a custom or usage which is actionable under 42 U.S.C. § 1983. See *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1957). It should be further emphasized again that we are not in this case being asked to hold these defendants liable for damages but only to grant injunctive relief to prevent further deprivation of the rights of citizens while in Millvale.

### (C) The Borough Council.

With respect to Borough Council the evidence shows that citizens soon learned that complaints to the Borough Council were useless. The Borough Council itself has, however, taken an active part in the Baranyai affair. It twice adopted resolutions supporting Baranyai's conduct on July 12, 1977, (Plaintiff's Ex. 15) and on February 14, 1978, (Plaintiff's Ex. 12).

Notwithstanding that Baranyai was convicted on criminal charges against him and this case was filed October 5, 1977, detailing the complaints against him, the Borough Council has nevertheless refused to take further action. Two members of the Borough Council who endeavored to induce it to do something about the situation and exercise its powers were voted down by a vote of 5 to 2 and were subject to personal abuse.

It has been held that if local authorities fail in their duties then judicial authority may be invoked. See *Swann v. Charlotte Mecklenburg School District*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) dealing with prison conditions subject to an administrative injunction to prevent further violation of constitutional rights of inmates when the court has exercised patience in the past in approaching the problem.

Beginning in 1975, the Borough Council began to get complaints about the conduct of Officer Baranyai and notwithstanding the verdict of guilty in the criminal cases and the bringing of this suit has failed to make any investigation or take any steps towards removing or suspending him. This is not a case like *Rizzo* depending on statistical proof. The proof here pinpoints violations by one police officer against individual citizens who have appeared on the stand and complained. The police officer is a defendant here as well as the other borough officials who are involved in this unhappy proceeding and whose actions have encouraged Baranyai in further violations. For what reason there has been this unusual extension of favors and encouragement to

Baranyai, the court cannot determine but we do determine that it has existed and the court does not believe that in such a situation the requirements of the federal constitution can go on being ignored and with the equitable relief provided for under the Civil Rights Act, 42 U.S.C. § 1983 denied. This is an extreme case but something must be done to protect citizens. We find this course of conduct on the part of Baranyai encouraged and supported by the other defendants in this case will continue unless some restraint is exercised by the court.

It is also noted that testimony indicates that defendants Porter and Baranyai believe that there is a widespread conspiracy against them by the Mafia, by Civil Rights organizations and by the Pennsylvania Department of Justice and that questioning of Baranyai's conduct is improper and illegal. What this indicates with respect to Baranyai's thinking, we cannot at this time determine. Defendant Porter has attempted to retaliate against and harass and intimidate the Pennsylvania Department of Justice for taking up the cudgels in favor of citizens in this case. The deputy attorney general filing this suit was shortly thereafter arrested for harassment and an attempt has been made to get the Pennsylvania Attorney General to disband the community advocate unit. Under these circumstances, we have no hesitation in finding that all the defendants in this case were causally linked to the police abuse by Officer Baranyai, that there was a pervasive pattern of support for him and his misconduct and this amounts to a custom and usage under 42 U.S.C. § 1983 and *Monell,* supra. As was explicated by our Court of Appeals in *Lewis v. Hyland,* 554 F.2d 93 (3d Cir. 1977) with respect to *Rizzo, Rizzo* does allow limited federal intervention into state police practices in those instances where it could be found that a pervasive pattern or policy of unconstitutional behavior was causally related to the named official defendants. We so find in this case. See also *Santiago v. Philadelphia,* supra.

We are not at this moment in this case particularly concerned with the question of imposing the federal courts upon the operations of the state of Pennsylvania or its municipalities by granting of equitable relief because, as noted, the Commonwealth of Pennsylvania is one of the plaintiffs here and is specifically asking for such intervention. We are still, of course, mindful of the delicacy of adjustments between federal equitable power and the administration of the affairs of this borough by elected officials. But when the State of Pennsylvania confesses it has no handy remedy to prevent the abuse of citizens as shown in this case from continuing certainly the federal courts have a right to vindicate the federal constitution.

### (8) Remedies.

As has been pointed out in *Swann v. Charlotte Mecklenburg Board of Education,* supra, and *Monell,* supra, the court has wide discretion in determining appropriate remedies to be employed in a situation such as exists here.

We are cautioned, of course, by the Court of Appeals for this Circuit in *Lewis v. Hyland,* supra, involving a proposed injunction against the New Jersey State Police where the lower court did find a pattern and practice of constitutional violations by individual policemen but could not find that there was joinder in such acts by supervisory officials, *Rizzo,* supra, is a roadblock of formidable dimensions. The court in *Lewis v. Hyland,* supra, however, did find that where a plan or practice was found which is a causal link to the individual officer's conduct, relief may be granted. We have so found in this case and hold that this case goes far beyond the mere failure to act as in *Rizzo.* Rather, it falls within the pattern of *Allee v. Medrano,* supra, and *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

As we have noted previously, much of *Rizzo* appears to be based upon the delicate balance between federal and state authority in our system of federalized government in this country and a desire not to intrude upon the day-to-day operations of a large metropolitan police force.

We have some precedent in the decision of Judge Snyder of this court in *Wecht v. Marstellar*, 363 F.Supp. 1183 (W.D.Pa.1973) where a Pittsburgh City motorcycle policeman had engaged in a course of illegal and unconstitutional conduct using wrongful and excessive force and the evidence disclosed a pattern that violated the constitutional rights of users of the sidewalks and streets of the City of Pittsburgh. An injunction was issued prohibiting the defendant from engaging in certain specific types of acts.

In the case at bar we find that for Officer Baranyai to continue to act as a policeman upon the streets of Millvale will only lead to further disruptions and violations of constitutional rights and that some injunction is necessary to protect the citizens from continuing future happenings of this kind.

We are admonished as heretofore noted by the decision of the U.S. Supreme Court in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 28 L.Ed.2d 554 (1978) to exercise patience in cases of this kind and not to intrude the federal court into day-to-day management of a penal institution except as a last resort. As expressed by Judge Snyder in *Wecht v. Marstellar,* supra, the deprivations of the constitutional rights of citizens must be stopped but there should be no unnecessary encroachment on state and local government functions. Equitable relief in such circumstances must be specifically tailored to fit the events of a particular case. *Schweiker v. Gordon*, 442 F.Supp. 1134 (E.D.Pa.1977).

In assessing the interference of this court in state and municipal governments, we must remember that 42 U.S.C. § 1983 was enacted under the Fifth Section of the Fourteenth Amendment as appropriate legislation to carry out its purpose and we cannot permit the salutory purpose of § 1983 and the Fourteenth Amendment to be sidetracked by fear of undue interference with state and municipal governments, particularly where, as here, the Commonwealth of Pennsylvania is asking this court to protect its citizens from the depredations of this one individual and those acting in concert with him. We hold that the injunctive relief herein provided will not interfere unduly with the daily internal workings of the Millvale Police Department in accordance with the teachings of *Rizzo*. See *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1975).

(D) Conclusions of Law.

(1) This court has jurisdiction over this action and these defendants.

(2) Local law enforcement officials who act under color of state law and who use excessive force or who make illegal arrests or who otherwise deny citizens their constitutional rights are subject to the equity powers of this court under 42 U.S.C. § 1983. Defendants, under color of state law, have engaged in a course of illegal and unconstitutional conduct by using wrongful and excessive physical force on numerous occasions, making illegal arrests, conducting illegal searches, by intimidating and harassing citizens, and by retaliating against those who would complain of such illegal and unconstitutional conduct.

(3) The actions of defendants were directed against various citizens, some of whom were in the custody and control of defendant Baranyai and some of whom were otherwise lawfully upon the streets and sidewalks of the Borough of Millvale.

(4) The deprivation of constitutional rights of the plaintiffs and the persons they represent constitutes irreparable harm for which they are entitled to equitable relief.

(5) Plaintiffs do not have an adequate remedy at law.

(6) Injunctive relief is essential to prevent defendants from continuing to deprive plaintiffs and the individuals they represent of their constitutional rights.

(7) The evidence in this case shows a pervasive pattern of participation, affirmance, encouragement and aiding and abetting of the unlawful conduct of Baranyai by the other defendants.

(8) It is clear that the unlawful conduct of defendants in violating the constitutional rights of plaintiffs and the individuals they represent may recur unless enjoined.

(9) On the basis of the evidence as presented in this case which shows a continued course of conduct on the part of defendants, which course of conduct violates the constitutional rights of the plaintiffs and those individuals they represent, it is the conclusion of this court that a permanent injunction should issue against defendants enjoining them as set forth in the order accompanying this opinion.

We reserve for future determination the rights, if any, of plaintiff's attorneys to counsel fees and expenses. The attorneys for the plaintiff, if they intend to seek such counsel fees and expenses, are directed to file appropriate petitions for the same with details of time spent as required by the cases in the Court of Appeals of this Circuit within 20 days from the date of this opinion.